## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| DANA JONES, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>AT&T, INC.,<br><br>                    Defendant. | Case No. 3:24-cv-01766<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Dana Jones ("Plaintiff") individually and on behalf of a class of similarly situated individuals (the "Class," defined below) brings this class action against Defendant AT&T, Inc. ("AT&T" or "Defendant"). Plaintiff makes the following allegations based upon personal knowledge as to her own actions and upon information and belief as to all other matters and believe that reasonable discovery will provide additional evidentiary support for the allegations herein.

## INTRODUCTION

1.      With over 241.5 million subscribers, AT&T is the largest wireless carrier in the United States.[1] It collects vast troves of personal information from its customers and prospective customers and profits from that data through its own marketing efforts and by selling sensitive consumer information to third parties. AT&T understood it had an enormous responsibility to protect the data it collected and assured consumers through its Privacy Policy that AT&T uses "technology controls and organizational controls . . . [to] protect our computer storage and

---

[1] AT&T's Current Report (SEC Form 8-K) (Jan. 24, 2024), available at https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2023/4q-2023/ATT_4Q_2023_8_K_Earnings_8_01.pdf (last viewed May 10, 2024).

network equipment." Its Privacy Center likewise assured consumers that "[y]our privacy is important to you and to us."[2]

2.      AT&T failed to meet these obligations to protect sensitive consumer data. In March 2024, AT&T publicly disclosed that it had suffered one of the largest and most consequential data breaches (the "Data Breach") in U.S. history, compromising the sensitive personal information of approximately 7.6 million current and 65.4 million former AT&T customers.[3]

3.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' and employees' Private Information from the foreseeable threat of a cyberattack.

4.      By taking possession and control of Plaintiffs' and Class Members' Private Information for its own pecuniary benefit, Defendant assumed a duty to securely store and protect the Private Information in its custody from the risk of a cyber intrusion. Defendant also had a duty to adequately safeguard this Private Information under industry standards and duties imposed by statutes, including HIPAA regulations and Section 5 of the Federal Trade Commission Act ("FTA Act").

5.      As a result of AT&T's failure to implement adequate data security practices, Plaintiffs and millions of Class Members suffered injury and ascertainable losses in the form of out-of-pocket expenses, loss of value of their uncompensated time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from

---

[2] AT&T Privacy Notice, AT&T, available at https://about.att.com/privacy/privacy-notice.html (last viewed May 10, 2024).

[3] *What customers should know about AT&T's massive data breach,* Khristopher J. Brooks, available at https://www.cbsnews.com/news/att-data-breach-2024-cbs-news-explains/ (last viewed May 10, 2024).

its exposure, and the present and imminent threat of fraud and identity theft.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists as Defendants are citizens of States different from that of at least one Class member. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy. Plaintiff is a citizen of Washington state.  Defendant is a citizen of Texas.

7.      This Court has personal jurisdiction over AT&T because it is authorized to and has its principal place of business in the Dallas Division of the Northern District of Texas. AT&T sells, markets, and advertises its products and services to Plaintiff and Class Members located in the Dallas Division of the Northern District of Texas and, therefore, has sufficient minimum contacts to render the exercise of jurisdiction by this Court proper and necessary.

8.      Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in the Dallas Division of the Northern District of Texas and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## DEFENDANT

9.      Defendant AT&T is a telecommunications company that provides wireless voice, messaging, and data services along with mobile phones and accessories. Defendant AT&T's principal place of business is located at 208 South Akard Street in Dallas, Texas and is incorporated under the laws of the State of Delaware. The registered agent for service of process is CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201. Defendant is a citizen

of Texas.

## **PLAINTIFF**

10.    Plaintiff Jones is an individual who, upon information and belief, had her personally identifiable information ("PII," as defined below) exfiltrated and compromised in the Data Breach, and she brings this action on behalf of herself and all those similarly situated within her residential state, Washington. The following allegations are made upon information and belief derived from, among other things, investigation of counsel, public sources, and the facts and circumstances as currently known. Because only AT&T (and the hackers) have knowledge of what information was compromised for each individual Class member, Plaintiff reserves her right to supplement her allegations with additional facts and injuries as they are discovered. Plaintiff is a citizen of Washington state.

11.    Plaintiff places significant value in the security of her PII. Plaintiff entrusted her sensitive PII to AT&T with the understanding that AT&T would keep her information secure and employ reasonable and adequate security measures to ensure that it would not be compromised. If Plaintiff had known of AT&T's lax security practices with respect to her PII, she would not have done business with AT&T, would not have applied for AT&T's services or purchased its products, would not have opened, used, or continued to use AT&T's cell phone and other telecommunications-related services at the applicable rates and on the applicable terms, or would have paid less because of the diminished value of AT&T's services.

12.    As a result of AT&T's exposure of Plaintiff's PII, she has spent hours attempting to mitigate the affects of the Data Breach, including monitoring financial and other important accounts for fraudulent activity. Plaintiff anticipates that she will also have to spend significant uncompensated time in the future on those tasks, as they are ongoing and time consuming.

13.     Given the highly-sensitive nature of the information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff has already suffered injury and remains at a substantial and imminent risk of future harm.

## FACTUAL ALLEGATIONS

**A.     AT&T Collects, Stores, and Profits from Consumer Information, and Promises to Keep It Secure.**

14.     AT&T is a U.S. telecommunications company tracing its origins back to the American District Telegraph Company, formed in 1878.  Following a series of mergers and acquisitions—including the acquisition of BellSouth Corporation in 2006—AT&T grew to be the largest wireless carrier in the United States, with over 241.5 million current subscribers. AT&T is a publicly traded company organized and operated for the profit and financial benefit of its shareholders. In 2023, AT&T had annual gross revenues of over $122.4 billion, with net income over $15.62 billion. [4]

15.     AT&T has distinguished itself from its competitors by citing its legacy of "connecting people" by "powering the world's first phone call in 1876, [. . .] helping NASA call a man on the moon 240,000 miles away, and creating the life-saving 911 emergency system we all depend on."

16.     As the carrier that "connect[s] people for good," AT&T offers different types of plans, including unlimited plans, prepaid plans, plans for first responders and plans for the military, veterans, teachers and medical professionals.[5]

---

[4] AT&T's Current Report (SEC Form 8-K) (Jan. 24, 2024), available at https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2023/4q-2023/ATT_4Q_2023_8_K_Earnings_8_01.pdf (last viewed May 10, 2024).

[5] AT&T, *Plans for every need*, available at https://www.att.com/plans/wireless (last viewed May 10, 2024).

17.     To run its business, AT&T collects, maintains, and profits from the PII of millions of U.S. consumers. PII is information that is used to confirm an individual's identity and can include an individual's name, Social Security number, driver's license number, phone number, financial information, and other identifying information unique to an individual. For AT&T, this information also included unique technical identifiers tethered to customers' mobile phones. AT&T collects this PII from all prospective and current customers and maintains and profits from the PII regardless of whether a potential customer eventually selects AT&T as a wireless carrier. AT&T also maintains this PII for former customers for an indefinite period of time.

18.     AT&T's Privacy Policy is available on its website and provides customers with detailed promises regarding the treatment of their PII, including how AT&T uses customers' data for its own benefit and profit. For example, AT&T confirms that it uses customers' personal data to "understand which additional products and services may interest you and others"; and to "[d]esign and deliver advertising, marketing and promotional campaigns to you and others."

19.     Based on the customer PII AT&T collects and sells, AT&T states that "[t]his information can be used to analyze and track online activity or deliver ads and content tailored to your interests."

20.     AT&T also "may share information with affiliates and other companies to deliver our ads and marketing or to assess their effectiveness."

21.     In addition, AT&T partners with non-AT&T companies in cases where "you enjoy a service from us that directly involves another business. For instance, we might provide the Wi-Fi service at a place you visit. As part of our service, we may provide aggregate metrics reports to that business about how the Wi-Fi is being used, such as aggregated location and web-browsing data."

22.     When AT&T shares customer data, it professedly requires its affiliates to "follow [AT&T's] Privacy Notice regarding your info, not just their own policy." Additionally, AT&T "require[s] them to use it only for the intended purpose and to protect it consistent with this notice."

23.     After listing the ways AT&T benefits and profits from tracking and targeting its customers and non-customers through collecting and maintaining their valuable PII, AT&T's Privacy Policy pledges to them that "[w]e work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs. And we require callers and online users to authenticate themselves before we provide account information." As discussed herein, AT&T failed to comply with these promises to protect Plaintiff's PII.

**B.     Despite Its Promises, AT&T Failed to Protect Plaintiff's Sensitive PII.**

24.     At the same time AT&T collected, stored, and profited from Plaintiff's PII—and was actively communicating to consumers that "[w]e work hard to safeguard your information"—it suffered a massive data breach.

25.     PII stolen in data breaches is often sold in dark-web marketplaces, usually referred to as carding forums. In these forums, cybercriminals don't just sell and buy PII, but also share information and tips on how to hack websites and use stolen data. Some of these marketplaces are highly sophisticated and even offer guarantees on the usability of the data, including moneyback guarantees. The stolen data sold or shared is then used by criminals to engage in various fraudulent schemes targeted at the data breach victims.

26.     In 2021, on one such black-market dark-web forum known as "RaidForums," a threat actor using the pseudonym ShinyHunters unveiled for the first time a database containing PII of 70 million AT&T customers. ShinyHunters offered to auction off the database to RaidForum's clientele of hackers, scammers, and other cybercriminals, setting the starting price at $200,000 with incremental offers of $30,000. Alternatively, ShinyHunters claimed willingness to sell it immediately for $1 million.[6]  The offer included a sample of personal data from the breach, indicating it included customers' names, addresses, phone numbers, Social Security numbers, and dates of birth.[7]

27.     Since 2020, ShinyHunters has orchestrated many legitimate mass data breaches, including Microsoft's GitHub, Tokopedia, Wattpad, and Pixlr.[8] Given the group's notorious reputation, dismissing its claims without a thorough investigation into the possibility is irresponsible, at the very least, and inconsistent with a company that claims "[y]our privacy is important to you and to us."

        //

---

[6] Lawrence Abrams, *AT&T denies data breach after hacker auctions 70 million user database* (Aug. 20, 2021) available at https://www.bleepingcomputer.com/news/security/atandt-denies-data-breach-after-hacker-auctions-70-million-user-database/ (last viewed May 13, 2024).

[7] *Id.*

[8] *Unveiling ShinyHunters: Exploring the Enigmatic Cyber Threat Group* (Mar. 22, 2024), available at: https://socradar.medium.com/unveiling-shinyhunters-exploring-the-enigmatic-cyber-threat-group-7a43319be79c (last viewed May 14, 2024).

**RaidForums Post Offering to Sell AT&T Data[9]**



28.    At the time, AT&T denied the data came from its internal systems and refused to speculate on where it came from, such as from one of its affiliates or partner companies, or even whether the data was valid.[10] While AT&T's privacy policy ostensibly holds its affiliates and partner companies to a high standard for data security, its disclaimer of any knowledge about potential sources of the data leak indicates a significant area of vulnerability.

29.    On March 17, 2024, another threat actor using the pseudonym MajorNelson leaked a substantial database of user data on RaidForums, claiming it was the same data set originally stolen by ShinyHunters.[11]

---

[9] *Id.*

[10] *Id.*

[11] Lawrence Abrams, *AT&T confirms data for 73 million customers leaked on hacker forum* (Mar. 30, 2024), available at https://www.bleepingcomputer.com/news/security/atandt-confirms-data-for-73-million-customers-leaked-on-hacker-forum/ (last viewed May 13, 2024).

**RaidForums Post Leaking Alleged AT&T Data from 2011 Breach[12]**



30.    Again, AT&T initially denied the data breach, but at the end of March admitted that "a number of AT&T passcodes have been compromised." Further, AT&T pledged to "reach[] out to all 7.6M impacted customers. . . with compromised sensitive personal information."[13]

31.    Still, AT&T avoided claiming responsibility for the leaked data. In a news release, AT&T stated it "determined that AT&T data-specific fields were contained in a data set released on the dark web approximately two weeks ago." However, AT&T hedged that it did not "know[] whether the data in those fields originated from AT&T or one of its vendors. With respect to the balance of the data set, which includes personal information such as social security numbers, the source of the data is still being assessed."[14]

---

[12] *Id.*

[13] *Id.*

[14] AT&T Addresses Recent Data Set Released on the Dark Web (Mar. 30, 2024), available at
https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html (last viewed May 13, 2024).

32.    AT&T has admitted that account data for more than 7.6 million current account holders and 65.4 million former account holders was compromised in the Breach. According to AT&T's Notice of Data Breach, what data was exposed varied by individual and account, but may have included full name, email address, mailing address, phone number, Social Security number, date of birth, AT&T account number and AT&T passcode. Further, AT&T determined the data was from June 2019 or earlier.

**C.    AT&T Failed to Protect Plaintiff's PII, and Then Compounded Its Failure by Providing Inadequate Notice to Those Impacted.**

33.    In announcing the data breach, AT&T acknowledged the gravity of the situation by stating "We apologize this has happened. You are a valued customer and we are committed to keeping your information secure."[15]

34.    In recognition that Plaintiff and Class Members will face fraud and identity theft as a result of AT&T's failure to protect their PII, AT&T reset its customers' passcodes, offered them one year of identity protection services through Experian's IdentityWorks, and told them to remain vigilant by monitoring their personal accounts and credit reports for suspicious activity.[16]

35.    But this effort to notify Plaintiff and Class Members fell short of providing key information about the Breach. As evidenced by its submission to the Washington State Attorney General, AT&T's notices to impacted consumers consisted of brief letters with little substantive information.[17] For example, the notices only stated that "[t]o the best of our knowledge, the

---

[15] Letter from AT&T's Counsel to Washington State Attorney General's Office (Apr. 9, 2024), available at https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachA28614.pdf  (last visited May 17, 2024).

[16] *Id.*

[17] *Id.*

compromised data does <u>not</u> include personal financial information or call history." A separate notice indicated that "[t]he information varied by individual and account, but may have included full name, email address, mailing address, phone number, social security number, date of birth, AT&T account number and AT&T passcode."[18]

36.    AT&T's notices to victims of the Breach failed to provide any concrete information as to what types of their PII had been impacted.

37.    AT&T's deficient notices compounded the harm suffered by Plaintiff and Class Members, by failing to timely provide Breach victims with the very details necessary to protect themselves.

**D.    AT&T Has a Long History of Repeated Data Breaches.**

38.    The Breach and resulting harm suffered by Plaintiff and Class Members and the class is directly attributable to AT&T's history of security lapses and data mismanagement. Indeed, AT&T is no stranger to cybersecurity incidents resulting from its flawed security. Rather, data breaches have been a nearly annual event for the company for many years.

39.    In June 2010, hackers exploited a vulnerability on AT&T's website and collected iPad identification numbers (ICC-IDs) associated with those devices using the AT&T network. Cybercriminals can use those ID numbers to derive the email addresses associated with them.[19]

40.    Two times in 2014, third-party vendors and AT&T call center employees exposed the names and Social Security numbers of over 280,000 AT&T customers. The data was likely

---

[18] *Id.*

[19] Firewall Times, *AT&T Data Breaches: Full Timeline Through 2023* (Oct. 5, 2023) located at https://firewalltimes.com/att-data-breaches/ (last viewed May 17, 2024).

sold to criminals wishing to unlock mobile devices to enable resale.[20]

41.    Between 2012 and 2017, several call center employees in Bothell, Washington were bribed to install malware and unauthorized hardware in AT&T's systems. Initially, they focused on unlocking phones based on a list of IMEIs. The hackers unlocked more than 2 million devices.[21]

42.    As described above, ShinyHunters tried to auction off data of over 70 million AT&T customers in August 2021. At the time, AT&T denied that the data came from its systems; however, recent investigations of the related 2024 breach revealed that the data set includes AT&T specific fields.[22]

43.    In August 2022, Hold Security, a cybersecurity firm, discovered stolen data for approximately 23 million Americans. The data included names, Social Security numbers, and dates of birth. Based on email domains, physical addresses, AT&T internet service areas, and AT&T corporate addresses, Hold Security determined that the data likely related to current or former AT&T customers. Again, AT&T was unwilling to confirm or deny that the data came from its systems.[23]

44.    In March 2023, approximately 9 million customers received notification from AT&T that data relating to their wireless plans and payment amounts had been compromised after a cybersecurity attack on one of AT&T's third-party vendors.

45.    Given the numerous data breaches pre-dating the Breach at issue in this case,

---

[20] *Id.*

[21] *Id.*

[22] AT&T Addresses Recent Data Set Released on the Dark Web (Mar. 30, 2024), available at https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html (last viewed May 13, 2024).

[23] Firewall Times, *AT&T Data Breaches: Full Timeline Through 2023* (Oct. 5, 2023) located at https://firewalltimes.com/att-data-breaches/ (last viewed May 17, 2024).

AT&T was clearly aware of its data security failures, and the fact that subsequent breaches have occurred reinforces that Plaintiff's PII, which remains in AT&T's possession, is not safe.

### E.     AT&T Failed to Comply with Regulatory Guidance and Industry-Standard Cybersecurity Practices.

46.     AT&T's long and well-documented history of data security failures is attributable to its neglect in complying with state and federal laws and requirements as well as industry standards governing the protection of PII.

47.     For example, at least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain PII to implement and maintain "reasonable security procedures and practices" and to protect PII from unauthorized access. A group of Washington state Senators aims to enact one of the most comprehensive data security laws in the nation. Senate Bill 6281 would require a business to "establish, implement, and maintain reasonable administrative, technical, and physical data security practices to protect the confidentiality, integrity, and accessibility of personal data. Such security practices shall be appropriate to the volume and nature of the personal data at issue."

48.     AT&T failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and industry-standard cybersecurity practices. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Defendant. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

49.     In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*,

which established guidelines for fundamental data security principles and practices for business.[24] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

50.    The FTC recommends that businesses delete payment card information after the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

51.    The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

52.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[24]    Federal Trade Commission, *Protecting PII: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf    (last visited May 71, 2024).

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

53.     AT&T was aware of its obligations to protect its customers' PII and privacy before and during the Data Breach yet failed to take reasonable steps to protect customers from unauthorized access. In this case, AT&T was at all times fully aware of its obligation to protect the PII of AT&T's prospective, former, and current customers because of its status as a one of the United States' largest telecommunications companies. AT&T was also aware of the significant repercussions if it failed to do so because AT&T collected PII from millions of consumers and it knew that this PII, if hacked, would result in injury to consumers, including Plaintiff and Class Members.

54.     Based upon the known details of the Data Breach and how it occurred, AT&T also failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, proper firewall configuration, network segmentation, secure credential storage, rate limiting, user-activity monitoring, data-loss prevention, and intrusion detection and prevention.

**F.     The Effect of The Data Breach on Plaintiff and Class Members.**

55.     AT&T's failure to keep Plaintiff's and Class Members' PII secure has had severe ramifications. Given the sensitive nature of the PII stolen in the Data Breach— full names, email addresses, mailing addresses, phone numbers, Social Security numbers, and dates of birth— hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff and Class Members have suffered injury and face an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

16

56.     Plaintiffs and Class members face an imminent and substantial risk of injury of identity theft and related cyber crimes due to the Data Breach. Once data is stolen, malicious actors will either exploit the data for profit themselves or sell the data on the dark web to someone who intends to exploit the data for profit. Hackers would not incur the time and effort to steal PII and then risk prosecution by listing it for sale on the dark web if the PII was not valuable to malicious actors.

57.     The dark web helps ensure users' privacy by effectively hiding server or IP details from the public. Users need special software to access the dark web. Most websites on the dark web are not directly accessible via traditional searches on common search engines and are therefore accessible only by users who know the addresses for those websites.
Malicious actors use PII to gain access to Class members' digital life, including bank accounts, social media, and credit card details. During that process, hackers can harvest other sensitive data from the victim's accounts, including personal information of family, friends, and colleagues.

58.     Consumers are injured every time their data is stolen and placed on the dark web, even if they have been victims of previous data breaches. Not only is the likelihood of identity theft increased, but the dark web is not like Google or eBay. It is comprised of multiple discrete repositories of stolen information. Each data breach puts victims at risk of having their information uploaded to different dark web databases and viewed and used by different criminal actors.

59.     The U.S. Government Accountability Office determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen

data have been sold or posted on the Web, fraudulent use of that information may continue for years."[25] Moreover, there is often significant lag time between when a person suffers harm due to theft of his or her PII and when her or she discovers the harm. Plaintiff and Class Members will therefore need to spend time and money to continuously monitor their accounts for years to ensure their PII obtained in the Data Breach is not used to harm them. Plaintiff and Class Members thus have been harmed in the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of AT&T's Data Breach. In other words, Plaintiff and Class Members have been harmed by the value of identity protection services they must purchase in the future to ameliorate the risk of harm they now face due to the Breach.

60.    Plaintiff and Class Members have also realized harm in the lost or reduced value of their PII. AT&T admits the PII compromised in the Breach is valuable. As discussed above, AT&T collects, retains, and uses Plaintiff's and Class Members' PII to increase profits through predictive and other targeted marketing campaigns. Plaintiff's and Class Members' PII is not only valuable to AT&T, but Plaintiff and Class Members also place value on their PII based on their understanding that their PII is a financial asset to companies who collect it.[26]

61.    Plaintiff and Class Members have also been harmed and damaged in the amount of the market value of the hacker's unauthorized access to Plaintiff's and Class Members' PII

---

[25] U.S. Gov't Accountability Off., GAO-07-737, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 42 (2007), https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm (last visited May 17, 2024).

[26] *See, e.g.*, Ponemon Institute, LLC, Privacy and Security in a Connected Life: A Study of US, European and Japanese Consumers at p. 14 (March 2015) (explaining that 53% of respondents "believe personal data is a financial asset similar to traded goods, currencies or commodities" and valuing, as but one example, their Social Security number at $55.70), available at https://docplayer.net/836701-Privacy-and-security-in-a-connected-life-a-study-of-us-european-and-japanese-consumers.html (last visited May 17, 2024).

that was permitted without authorization by AT&T. This market value for access to PII can be determined by reference to both legitimate and illegitimate markets for such information.

62.     Moreover, Plaintiff and Class Members value the privacy of this information and expect AT&T to allocate enough resources to ensure it is adequately protected. Customers would not have done business with AT&T, provided their PII and payment card information, or paid the same prices for AT&T's goods and services had they known AT&T did not implement reasonable security measures to protect their PII.[27] Customers reasonably expect that the payments they make to the carrier, either prepaid or each month, incorporate the costs to implement reasonable security measures to protect customers' PII. And because consumers value data privacy and security, companies with robust data security practices can command higher prices than those who do not. As a result, Plaintiff and Class Members did not receive the benefit of their bargain with AT&T because they paid for services they expected but did not receive.

63.     Given AT&T's failure to protect its customers' PII despite multiple data breaches, Plaintiff and Class Members have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages, restitution, and disgorgement) that protects them from suffering further harm, as their PII remains in AT&T's possession. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

64.     Even when reimbursed for money stolen due to a data breach, consumers are not

---

[27] McKinsey & Company, *The consumer-data opportunity and the privacy imperative* (Apr. 27, 2020), https://www.mckinsey.com/capabilities/risk-and-resilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative (last visited May 17, 2024) (noting approximately 87% of would not do business with a company if they had concerns about its security practices; and 71% of consumers would stop doing business with a company if it gave away sensitive data without permission.).

made whole because the reimbursement fails to compensate for the significant time and money required to repair the impact of the fraud.

65.    Victims of identity theft also experience harm beyond economic effects. According to a 2018 study by the Identity Theft Resource Center, 32% of identity theft victims experienced negative effects at work (either with their boss or coworkers) and 8% experienced negative effects at school (either with school officials or other students).

66.    The U.S. Government Accountability Office likewise determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."

67.    In sum, Plaintiff and Class Members were injured as follows: (i) theft of their PII and the resulting loss of privacy in that information; (ii) improper disclosure of their PII; (iii) loss of value of their PII; (iv) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of AT&T's Data Breach; (v) AT&T's retention of profits attributable to Plaintiff's and Class Members' PII that AT&T failed to adequately protect; (vi) the certain, imminent, and ongoing threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (vii) ascertainable out-of-pocket expenses and the value of their time allocated to fixing or mitigating the effects of the Data Breach; (viii) overpayments to AT&T for goods and services purchased, as Plaintiff and Class Members reasonably believed a portion of the sale price would fund reasonable security measures that would protect their PII, which was not the case; and (ix) nominal damages.

## CLASS ACTION ALLEGATIONS

68.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff

brings this action on behalf of herself and a Nationwide Class defined as follows:

> **All natural persons residing in the United States whose PII was exfiltrated in
> the Data Breach.**

69.     Excluded from Nationwide Class are AT&T, any entity in which AT&T has a

controlling interest, and AT&T's officers, directors, legal representatives, successors,

subsidiaries, and assigns. Also excluded from the Nationwide Class are any judicial officer

presiding over this matter, members of their immediate family, and members of their judicial

staff.

70.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**. The members of the

Nationwide Class are so numerous and geographically dispersed that individual joinder of all

Class Members is impracticable. While the exact number of Class Members is unknown to

Plaintiff at this time, AT&T has acknowledged that millions of individuals' PII has been

compromised. Those individuals' names and addresses are available from AT&T's records, and

Class Members may be notified of the pendency of this action by recognized, Court-approved

notice dissemination methods.

71.     **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2)**

**and 23(b)(3)**. As to the Nationwide Class, this action involves common questions of law and fact

that predominate over any questions affecting individual Class Members. The common questions

include:

- Whether AT&T had a duty to protect PII;

- Whether AT&T failed to take reasonable and prudent security measures to ensure its
  systems were protected;

- Whether AT&T failed to take available steps to prevent and stop the Breach from happening;

- Whether AT&T knew or should have known that its computer and data storage systems were vulnerable to attack;

- Whether AT&T was negligent in failing to implement reasonable and adequate security procedures and practices;

- Whether AT&T's security measures to protect its systems were reasonable in light known legal requirements;

- Whether AT&T's conduct constituted unfair or deceptive trade practices;

- Whether AT&T violated state or federal law when it failed to implement reasonable security procedures and practices;

- Which security procedures and notification procedures AT&T should be required to implement;

- Whether AT&T has a contractual obligation to provide security to its data;

- Whether AT&T has complied with any contractual obligation to protect data;

- What security measures, if any, must be implemented by AT&T to comply with its contractual obligations;

- Whether AT&T violated state consumer protection laws in connection with the actions described herein;

- Whether AT&T failed to notify Plaintiff and Class Members as soon as practicable and without delay after the data breach was discovered;

- Whether AT&T's conduct resulted in or was the proximate cause of the loss of the PII of Plaintiff and Class Members;

- Whether Plaintiff and Class Members were injured and suffered damages or other losses because of AT&T's failure to reasonably protect their PII;

- Whether AT&T should retain the money paid by Plaintiff and Class Members to protect their PII;

- Whether AT&T should retain Plaintiff's and Class Members' valuable PII; and,

- Whether Plaintiff and Class Members are entitled to damages or injunctive relief.

72. **Typicality: Federal Rule of Civil Procedure 23(a)(3)**. As to the Nationwide

Class, Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way. Plaintiff's PII was in AT&T's possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiff's damages and injuries are akin to other Class Members and Plaintiff seeks relief consistent with the relief of the Class.

73.     **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4)**. Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

74.     **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against AT&T, and thus, individual litigation to redress AT&T's wrongful conduct would be impracticable. Individual litigation by each Class Member would

also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

75.    **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for AT&T or would be dispositive of the interests of members of the proposed Class.

76.    **Ascertainability.** The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. The Class consists of individuals who provided their PII to AT&T. Class Membership can be determined using AT&T's records.

77.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data. Plaintiff seeks prospective injunctive relief as a wholly separate remedy from any monetary relief.

78.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (By Plaintiff on behalf of the Class)

95.     Plaintiff incorporates and re-alleges all allegations above as if fully set forth herein.

96.     AT&T owes a duty of care to protect the Private Information belonging to Plaintiff and Class members. AT&T also owes several specific duties including, but not limited to, the duty:

    a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.    to protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

    c.    to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

    d.    to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class members pursuant to the FTCA;

    e.    to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

    f.    to promptly notify Plaintiff and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

97.     AT&T also owes this duty because Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 requires AT&T to use reasonable measures to protect confidential data.

98.     AT&T also owes this duty because industry standards mandate that AT&T protect its customers' confidential Private Information.

99.     AT&T also owes this duty because it had a special relationship with Plaintiff and Class members. Plaintiff and Class members entrusted their Private Information to AT&T on the

understanding that adequate security precautions would be taken to protect this information. Furthermore, only AT&T had the ability to protect its systems and the Private Information stored on them from attack.

100.    AT&T also owes a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiff and the Class. This duty exists to allow Plaintiff and the Class the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

101.    AT&T breached its duties to Plaintiff and the Class by failing to take reasonable appropriate measures to secure, protect, and otherwise safeguard the Private Information belonging to Plaintiff and the Class.

102.    AT&T also breached the duties it owed to Plaintiff and the Class by failing to timely and accurately disclose to Plaintiff and the Class that their Private Information had been improperly acquired and accessed.

103.    As a direct and proximate result of AT&T's conduct, Plaintiff and the Class were damaged. These damages include, and are not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

- Permanent increased risk of identity theft.

104.    Plaintiff and Class members were foreseeable victims of any inadequate security practices on the part of AT&T, and the damages they suffered were the foreseeable result of AT&T's inadequate security practices.

105.    In failing to provide prompt and adequate individual notice of the Data Breach, AT&T also acted with reckless disregard for the rights of Plaintiff and Class members.

106.    Plaintiff is entitled to damages in an amount to be proven at trial and injunctive relief requiring AT&T to, among other things, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(By Plaintiff on behalf of the Class)**

107.    Plaintiff incorporates and re-alleges all allegations above as if fully set forth herein.

108.    Plaintiff and the Class provided AT&T with their Private Information.

109.    By providing their Private Information, and upon AT&T's acceptance of this information, Plaintiff and the Class, on one hand, and AT&T, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract entered into between the parties.

110.    The implied contracts between AT&T, Plaintiff and Class members obligated AT&T to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiff's and Class members' Private Information. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above. AT&T expressly adopted and assented to these terms in its public statements, representations and promises as described above.

111.    The implied contracts for data security also obligated AT&T to provide Plaintiff and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Private Information.

112.    AT&T breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the Private Information belonging to Plaintiff and Class members; allowing unauthorized persons to access Plaintiff's and Class members' Private Information; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiff and Class members, as alleged above.

113.    As a direct and proximate result of AT&T's breaches of the implied contracts, Plaintiff and the Class have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of Private Information, and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(By Plaintiff on behalf of the Class)**

114.    Plaintiff incorporates and re-alleges all allegations above as if fully set forth herein.

115.    This count is brought in the alternative to Count III.

116.    Plaintiff and the Class have a legal and equitable interest in their Private Information that was collected and maintained by AT&T.

117.    AT&T was benefitted by the conferral upon it of Plaintiff's and Class members' Private Information and by its ability to retain and use that information. AT&T understood that it was in fact so benefitted.

118.    AT&T also understood and appreciated that Plaintiff's and Class members' Private Information was private and confidential, and its value depended upon AT&T maintaining the privacy and confidentiality of that information.

119.    But for AT&T's willingness and commitment to maintain its privacy and confidentiality, Plaintiff and Class members would not have provided or authorized their Private Information to be provided to AT&T, and AT&T would have been deprived of the competitive and economic advantages it enjoyed by falsely claiming that its data-security safeguards met reasonable standards. These competitive and economic advantages include, without limitation, wrongfully gaining customers, gaining the reputational advantages conferred upon it by Plaintiff and Class members, monetary savings resulting from failure to reasonably upgrade and maintain data technology infrastructures, staffing, and expertise, and realizing excessive profits.

120.    As a result of AT&T's wrongful conduct as alleged herein (including, among other things, its deception of Plaintiff and the Class, and the public relating to the nature and scope of the data breach; its failure to employ adequate data security measures; its continued maintenance and use of the Private Information belonging to Plaintiff and Class members without having adequate data security measures; and its other conduct facilitating the theft of that Private Information), AT&T has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

121.    AT&T's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class members' sensitive Private Information, while at the same time failing to maintain that information secure from intrusion.

122.    Under the common law doctrine of unjust enrichment, it is inequitable for AT&T to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and the Class in an unfair and unconscionable manner.

123.    The benefit conferred upon, received, and enjoyed by AT&T was not conferred officiously or gratuitously, and it would be inequitable and unjust for AT&T to retain the benefit.

124.    AT&T is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on AT&T as a result of its wrongful conduct, including specifically the value to AT&T of the PII that was accessed and exfiltrated in the Data Breach and the profits AT&T receives from the use and sale of that information.

125.    Plaintiff and Class members are entitled to full refunds, restitution, and/or damages from AT&T and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by AT&T from its wrongful conduct.

126.    Plaintiff and Class members may not have an adequate remedy at law against AT&T, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(By Plaintiff on behalf of the Class)**

127.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

128.    At all times during Plaintiff's and Class members' interactions with AT&T, AT&T was fully aware of the confidential and sensitive nature of Plaintiff's and Class members' PII.

129.     AT&T's relationship with Plaintiff and Class members was governed by expectations that Plaintiff's and Class members' protected PII would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

130.     Plaintiff and Class members provided their respective PII to AT&T with the explicit and implicit understandings that AT&T would protect and not permit the PII to be disseminated to the public or any unauthorized parties.

131.     Plaintiff and Class members also provided their respective PII to AT&T with the explicit and implicit understandings that AT&T would take precautions to protect the PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

132.     AT&T voluntarily received in confidence Plaintiff's and Class members' PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

133.     Due to AT&T failure to prevent, detect, avoid the Data Breach from occurring by following best information security practices to secure Plaintiff's and Class members' PII, Plaintiff's and Class members' PII was disclosed and misappropriated to the public and unauthorized third parties beyond Plaintiff's and Class members' confidence, and without their express permission.

134.     But for AT&T disclosure of Plaintiff's and Class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. The Data Breach was the direct and legal cause of the theft of Plaintiff's and Class members' PII, as well as the resulting damages.

31

135.    The injury and harm Plaintiff and Class members suffered was the reasonably foreseeable result of AT&T's unauthorized disclosure of Plaintiff's and Class members' PII. AT&T knew its computer systems and technologies for accepting, securing, and storing Plaintiff's and Class members' PII had serious security vulnerabilities because AT&T failed to observe even basic information security practices or correct known security vulnerabilities.

136.    As a direct and proximate result of AT&T's breaches of confidence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such damages include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; lost value of unauthorized access to their PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## **COUNT V**
### **Declaratory Judgment**
### **(By Plaintiff on behalf of the Class)**

137.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

138.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

139.    An actual controversy has arisen in the wake of the Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiffs remain at imminent risk that further compromises of their PII will occur in the future.

140.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    AT&T continues to owe a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes.

b.    AT&T continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

141.    The Court also should issue corresponding prospective injunctive relief requiring AT&T to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

142.    If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at AT&T. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

143.    The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to AT&T if an injunction is issued. Among other things, if another massive data breach occurs at AT&T, Plaintiff and Class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to AT&T of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

144.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at AT&T, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose PII would be further compromised.

## REQUEST FOR RELIEF

**WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:**

(a)    That the Court determine that Plaintiff's claims are suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiff as representative of the Class;

(c)    That Plaintiff's counsel be appointed as counsel for the Class;

(d)    That the Court award compensatory damages and punitive damages;

(e)    In the alternative, that the Court award nominal damages as permitted by law;

(f)    That the Court award injunctive or other equitable relief that directs AT&T to provide Plaintiff and the Class with free credit monitoring and identity theft protection, and to implement reasonable security procedures and practices to protect customers' PII that conform to relevant federal and state guidelines and industry norms;

(g)     That the Court award declaratory judgment in favor of Plaintiff determining that AT&T's failure to implement reasonable security measures gives rise to a claim;

(h)     That the Court award reasonable costs and expenses incurred in prosecuting this action, including attorneys' fees and expert fees; and

(i)     Such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated:  July 11, 2024                          Respectfully submitted,


*/s/ Joe Kendall*
JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
Telephone:  214/744-3000 / 214/744-3015 (fax)
jkendall@kendalllawgroup.com

Kim D. Stephens (*pro hac vice* forthcoming)
Jason T. Dennett (*pro hac vice* forthcoming)
Kaleigh N. Powell (*pro hac vice* forthcoming)
**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101
Ph: (206) 682-5600
Fax (206) 682-2992
kstephens@tousley.com
jdennett@tousley.com
kpowell@tousley.com

***Attorneys for Plaintiff and the Proposed Class***